**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SEAN JERVITT HOPKINS,** | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 1:05-2633** |
| **v.** | : | **(CALDWELL, D.J.)** |
| | | **(MANNION, M.J.)** |
| **WARDEN JOSEPH SMITH,** | : | |
| **HSA BROWN, HSA HEMPHILL,** | | |
| **HSA ZAGAME[1], REG. DIR. SCOTT** | : | |
| **DODRILL, HARLEY LAPPIN,** | | |
| **MARY ELLEN THOMS,** | : | |
| **DR. BUSSANICH, and AW OF** | | |
| **MEDICAL HUFFORD[2],** | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

Presently pending before the court is a motion to dismiss and for summary judgment filed on behalf of the defendants. (Doc. No. 27).

## I.  PROCEDURAL HISTORY

On December 20, 2005, the plaintiff, a former inmate at the United States Penitentiary, Lewisburg, ("USP-Lewisburg"), filed this Bivens[3] action alleging inadequate medical care for an eye condition from which he suffers.

---

[1]This defendant has been improperly referred to by the plaintiff in his complaint as "HSA Zacombi."

[2]This defendant has been improperly referred to by the plaintiff in his complaint as "AW of Medical Hubbard."

[3]Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).

(Doc. No. 1).   On January 13, 2006, the plaintiff filed the appropriate application to proceed in forma pauperis, (Doc. No. 6), and authorization form, (Doc. No. 7).  As a result, a financial administrative order was issued on the same day.  (Doc. No. 8).

By order dated January 20, 2006, it was directed that process issue. (Doc. No. 10).

After having been granted extensions of time to do so, (Doc. Nos. 18, 26), on July 10, 2006, the defendants filed a motion to dismiss the plaintiff's complaint and for summary judgment.  (Doc. No. 27).  Again, after having been granted an extension of time to do so, (Doc. No. 29), on July 27, 2006, the defendants filed a supporting brief, (Doc. No. 33), along with a statement of facts and supporting exhibits, (Doc. No. 34).  On August 15, 2006, the plaintiff filed a brief, (Doc. No. 35), and affidavit, (Doc. No. 36), in opposition to the defendants' motion to dismiss and for summary judgment.

## II.    LEGAL STANDARDS

The defendants' motion is brought, in part, pursuant to the provisions of Fed.R.Civ.P. 12(b)(6).  This rule provides for the dismissal of a complaint, in whole or in part, if the plaintiff fails to state a claim upon which relief can granted.  Dismissal should only occur where it appears that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Accordingly, dismissal is

appropriate "only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint."  Trump Hotel and Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 483 (3d Cir. 1998)(citing ALA, Inc. v. CCair, Inc., 29 F.3d 855, 859 (3d Cir. 1994)).

In deciding a motion to dismiss, a court should generally consider only the allegations contained in the complaint, the exhibits attached to the complaint, matters of public record, and "undisputably authentic" documents which plaintiff has identified as the basis of his claim.  See Pension Benefit Guarantee Corp. v. White Consolidated Industries, Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).

It must also be remembered that when considering a motion to dismiss under Rule 12(b)(6), the important inquiry is not whether the plaintiff will ultimately prevail on the merits of his claim, but only whether he is entitled to offer evidence in support of them.  Scheuer v. Rhodes, 416 U.S. 233, 236 (1974).

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).

The Supreme Court has stated that:

3

> ". . . [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."

Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact.  Id.  The moving party can discharge that burden by "showing . . . that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

Issues of fact are genuine "only if a reasonably jury, considering the evidence presented, could find for the nonmoving party."  Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988)(citations omitted).  Material facts are those which will effect the outcome of the trial under governing law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The court may not weigh the evidence or make credibility determinations.  Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998).  In determining whether an issue of material fact exists, the court must consider all evidence and inferences drawn

4

therefrom in the light most favorable to the nonmoving party.  Id. at 393.

If the moving party meets his initial burden, the opposing party must do more than raise some metaphysical doubt as to material facts, but must show sufficient evidence to support a jury verdict in its favor.  Id.

## III.   DISCUSSION

In his complaint, the plaintiff alleges that he suffers from keratoconus[4], which the defendants have been aware of since 2001 when he was committed to USP-Lewisburg.  Although he indicates that he has been issued eyeglasses and contacts for his condition, the plaintiff states that these are no longer effective because of the progression of his condition.

On September 23, 2004, the plaintiff alleges that Dr. Herbert J. Ingraham, a cornea specialist, recommended that he have a cornea transplant.  According to the plaintiff's complaint, Dr. Ingraham was the third or fourth specialist with whom he treated while incarcerated.

In December of 2004, the plaintiff alleges that the Bureau of Prisons, ("BOP"), approved and designated him for transfer to a medical center for a cornea transplant.  Although defendant Smith informed him that he was to be

---

[4]Keratoconus is a conical protrusion of the center of the cornea with blurring of vision, but without inflammation.  This occurs most often in persons aged 20-60, and is often an inherited disease.  Taber's Cyclopedic Medical Dictionary at 1111 (19th ed.  2001).

transferred after the holidays, the plaintiff alleges that he was later told that bed space was not available for him and that it would take 4-6 months for him to be transferred.

According to the plaintiff, his treatment has been delayed because defendant Bussanich is of the opinion that his condition is not serious or severe.  The plaintiff alleges that defendant Bussanich has not examined him for his condition, nor is he a specialist in the field of optometry.  The plaintiff further alleges that defendant Bussanich does not have the authority or training to determine that his condition is not severe.

As a result of the delay in treating his condition, the plaintiff alleges that he has suffered severe pain and discomfort, headaches, blurry vision, trouble reading, seeing, writing, doing legal work and sensitivity to light.

The plaintiff alleges that the delay in receiving medical treatment and the inadequate medical care that he has received for his condition are in violation of his Eighth Amendment rights.  He is seeking compensatory and punitive damages.

Initially, in their motion, the defendants argue that the plaintiff's claims against defendants Zagame and Hemphill should be dismissed because, as employees of the United States Public Health Service, they cannot be sued in a Bivens action.  Instead, the defendants argue that the Public Health Service Act provides that an action against the United States under the Federal Tort Claims Act, ("FTCA"), is the exclusive remedy "for personal

6

injury, including death, resulting from the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment." 42 U.S.C. §233(a).  (Doc. No. 33, pp. 12-13).  The plaintiff concedes that the instant action is improper with respect to defendants Zagame and Hemphill.  (Doc. No. 35, p. 3).   Moreover,  he  admits  that  he  has  not  exhausted  his administrative remedies pursuant to the FTCA, such that any action against the United States would also be improper.  (Id.).  Therefore, the defendants' motion should be granted with respect to defendants Zagame, Hemphill, and, to the extent that, under the FTCA, it would be substituted as a defendant, the United States.

Next, the defendants argue that the plaintiff has failed to allege sufficient personal involvement on behalf of defendants Lappin, Thoms, Dodrill and Hufford to state a claim pursuant to §1331.  (Doc. No. 33, pp. 14-17).

To state a civil rights violation, the plaintiff must show that the defendants, acting under color of state law, deprived him of a right secured by the Constitution or laws of the United States.  42 U.S.C. §1983; Morse v. Lower Merion School District, 132 F.3d 902 (3d Cir. 1997);  Maine v. Thiboutot, 448 U.S. 1 (1980).  Moreover, civil rights liability is personal in nature and can only follow personal involvement in the alleged wrongful conduct shown through specific allegations of personal direction or of actual

7

knowledge and acquiescence. Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997)(citing Rhode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)).

With respect to defendants Lappin, Thoms and Hufford, other than naming these defendants in the caption of the complaint and identifying their respective positions, the plaintiff has failed to set forth any allegations of personal involvement with respect to these defendants.

To the extent that the plaintiff names the above individuals based upon their supervisory positions, relief cannot be granted against a defendant in a civil rights action based solely on the theory of respondeat superior or the fact that the defendant was the supervisor or superior of the person whose conduct actually deprived the plaintiff of one of his federally protected rights under color of state law.  Rouse v. Plantier, 182 F.3d 192 (3d Cir. 1999); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077 (3d Cir. 1976); Goode v. Rizzo, 506 F.2d 542, 550 (3d Cir. 1974), rev'd on other grounds, Rizzo v. Goode, 423 U.S. 362 (1976).

In light of the above, the defendants' motion to dismiss the plaintiff's complaint against defendants Lappin, Thoms, and Hopkins should be granted.

With respect to defendant Dodrill, the plaintiff alleges that, while at USP-Lewisburg, he "has been aware and dealt with plaintiff's issues." (Doc. No. 1, p. 2).  Giving the plaintiff the leeway he is due as a pro se litigant, Haines

8

v. Kerner, 404 U.S. 519, 520 (1972), the court finds that the plaintiff has alleged at least some personal involvement with respect to defendant Dodrill. Therefore, the defendants' motion to dismiss defendant Dodrill should be denied, only to the extent that it is argued that the plaintiff has failed to allege any personal involvement on his behalf.

The defendants further argue that any claim against the remaining defendants in their official capacity is barred by the doctrine of sovereign immunity. (Doc. No. 33, pp. 11-12).

With respect to this argument, a federal court is without jurisdiction to entertain a suit for money damages against the United States or its agencies unless sovereign immunity has expressly been waived. United States v. Mitchell, 445 U.S. 535, 538 (1980); United States v. Testan, 424 U.S. 392, 399 (1976); United States v., Sherwood, 312 U.S. 584, 586 (1941). The doctrine of sovereign immunity extends to individual officers sued in their official capacity, because an official capacity suit is "only another way of pleading an action against an entity of which an officer is an agent." Forbes v. Reno, 893 F.Supp. 476 (W.D.Pa. 1995)(citing Kentucky v. Graham, 473 U.S. 159, 165 (1985)). The plaintiff has brought this action pursuant to 28 U.S.C. §1331. However, this statute does not constitute a waiver of sovereign immunity. Forbes v. Reno, 893 F.Supp. 476, 481 (W.D. Pa. 1995) (citing B.K. Instrument, Inc. v. United States, 715 F.2d 713, 724 (2d Cir. 1983); Holloman v. Watt, 708 F.2d 1399, 1401 (9th Cir. 1983)). In fact, there is no sovereign

immunity waiver for claims of constitutional violations.  See F.D.I.C. v. Meyer, 510 U.S. 471 (1994) (holding that Bivens suit may not be maintained against the United States or its agencies).  Therefore, the defendants' motion should be granted to the extent that the plaintiff's complaint against the remaining defendants in their official capacity is barred by the doctrine of sovereign immunity.

Finally, the defendants argue that judgment should be entered for the remaining defendants in their individual capacity based upon the doctrine of qualified immunity.

Under the doctrine of qualified immunity, "[g]overnment officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Sharrar v. Felsing, 128 F.3d 810, 826 (3d Cir.1997)(quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)); In re City of Philadelphia Litig., 49 F.3d 45, 961 (3d Cir.1995).  "Qualified immunity requires a two-step analysis.  First, the Court must determine whether the plaintiff has alleged the violation of a constitutional right.  Second, the Court must determine whether that right was 'clearly established' at the time of the alleged violation." Weaver v. Clarke, 45 F.3d 1253, 1255 (8th Cir. 1995).

Pursuant to the first step of the above analysis, the defendants have submitted a statement of facts, supported by documentation, which

10

establishes that the plaintiff was convicted in the United States District Court for the District of Maryland for "use of a Firearm in a Crime of Violence; Felon in possession of a Firearm; and Assaulting, Opposing, Impeding, Intimidation and Interfering with Officers and Possession with Intent to Distribute Cocaine." (Doc. No. 34, Ex. 1). The plaintiff was sentenced to a life term of incarceration plus 300 months, to be followed by a six year term of supervision. (Id.).

The plaintiff has also been sentenced in the District of Columbia Superior Court to a life sentence (minimum term 20 years) for second degree murder while armed. (Id.). This sentence is to run concurrent with the plaintiff's District of Maryland sentence. (Id.). Since the plaintiff is serving a life term of incarceration, he has no projected release date. (Id.).

From August 13, 2001, through September 8, 2005, the petitioner was incarcerated at USP-Lewisburg. He was then transferred to the U.S. Medical Center for Federal Prisoners in Springfield, Missouri, ("USMCFP-Springfield"), where he had previously been incarcerated from October 19, 2000, through January 10, 2001, while he was a pre-trial detainee. (Doc. No. 34, Exs. 1 & 2).

During the plaintiff's initial stay at USMCFP-Springfield, physicians confirmed the plaintiff's diagnosis of keratoconus. (Doc. No. 34, Ex. 2). On December 8, 2000, a physician noted that, "[a] consultation was made to the ophthalmologist who noted the patient did indeed have keratoconus, but it is

11

not sufficiently significant to require any acute treatment at this time." (Id.).

The plaintiff was discharged from USMCFP-Springfield in January of 2001, and housed in various facilities, while he remained in pre-trial status, until his conviction and subsequent designation to USP-Lewisburg on August 13, 2001. (Id.).

On August 22, 2001, USP-Lewisburg medical staff referred the plaintiff for examination by a contract ophthalmologist. (Id.). It was noted that the plaintiff was previously diagnosed with keratoconus and that his treatment was delayed because of "pre trial confinement in county jails." (Id.).

The plaintiff was examined by the contract ophthalmologist on August 24, 2001, at which time the disease pathology was discussed with the plaintiff. (Id.). The plaintiff was informed that he would need to come to the doctor's office for further testing. A notation indicates "[n]o urgency, but must be done in the office." (Id.).

On August 28, 2001, defendant Bussanich prepared a consultation request, noting the ophthalmologist's recommendations and requesting that the plaintiff be seen at the "next available" opportunity. (Id.).

The plaintiff was again examined by the ophthalmologist on October 15, 2001. (Id.). At that time, the plaintiff was diagnosed with severe keratoconus. (Id.). It was recommended that the plaintiff attempt rigid contact lenses in concert with optometric services. (Id.).

On October 25, 2001, medical staff at USP-Lewisburg received the

12

plaintiff's prescription for corrective lenses.  (Id.).  New glasses were ordered for the plaintiff on October 30, 2001.  (Id.).

The plaintiff again treated with the ophthalmologist on November 2, 2001.  (Id.).  At this time, it was advised that the plaintiff undergo no further treatment until he received his lenses.  (Id.).

On November 27, 2001, the plaintiff was seen by a contract optometrist. (Id.).  It was noted "wait on call from MD Ophth.  Wants new Rx."  (Id.).

On December 5, 2001, another new pair of glasses was ordered for the plaintiff.  (Id.).

Medical staff at USP-Lewisburg were informed that additional information was needed from the ophthalmologist before the plaintiff's rigid contact lenses could be processed.  As a result, the ophthalmologist was asked to provide the additional information.  In addition, the medical staff inquired as to whether the ophthalmologist's office would provide the lenses. (Id.).  Referral paperwork was completed by the medical staff, which requested that the plaintiff be seen by the ophthalmologist no later than January of 2002.  (Id.).

On January 25, 2002, the necessary hard contact lense measurements were completed by the ophthalmologist.  (Id.).

The plaintiff's rigid contact lenses were ordered on February 4, 2002. (Id.).

On March 21, 2002, the plaintiff saw the optometrist and received his

13

contact lenses. (Id.). The plaintiff was scheduled to see the optometrist again on April 18, 2002. However, the plaintiff's appointment was postponed because he was confined in the Special Housing Unit, ("SHU"), and the contractor did not have the proper equipment to do the contact lens check. (Id.).

On May 7, 2002, the plaintiff was seen by the optometrist and given additional contact lens solution. (Id.). At that time, a notation indicates "no questions, inmate happy." (Id.).

On February 18, 2003, the plaintiff treated with the optometrist, who instructed that the plaintiff should have an indefinite supply of contact lens solution. (Id.). Medical staff ordered the plaintiff's solution on the following day. (Id.).

On February 27, 2003, medical staff ordered another pair of glasses for the plaintiff. (Id.).

On March 5, 2004, the plaintiff was instructed to report to sick call if he needed any additional contact lens solution. (Id.).

On March 30, 2004, the plaintiff treated with the optometrist, who suggested that the plaintiff be referred to an ophthalmologist. (Id.). Defendant Bussanich completed the paperwork for the referral on the following day, requesting that the plaintiff be seen in either April or May 2004. (Id.). The plaintiff was seen by the ophthalmologist on April 23, 2004. (Id.). The ophthalmologist recommended that the plaintiff be seen by a cornea

14

specialist for evaluation for a corneal transplant in his right eye.  (Id.).

On April 26, 2004, defendant Bussanich began the request for the plaintiff's evaluation for a possible corneal transplant.  (Id.).  A second consultation request was submitted by defendant Bussanich on May 12, 2004.  (Id.).  In addition, an administrative note was made on the same day, which directed that the plaintiff receive artificial tears for use in each eye.  (Id.).

On June 10, 2004, and September 2, 2004, the plaintiff received follow-up care from the optometrist.  (Id.).

On September 23, 2004, the plaintiff was evaluated by a corneal transplant specialist, who suggested a corneal transplant for the plaintiff's right eye.  (Id.).  A consultation sheet was completed by medical staff on that date requesting that the transplant be scheduled for the plaintiff.  (Id.).  Defendant Bussanich signed the form on October 1, 2004.  (Id.).

On October 8, 2004, defendant Bussanich indicated that he had completed the initial referral to the federal medical center for the plaintiff.  (Id.).  A transfer referral was completed on November 29, 2004.  (Id.).

The defendants' materials provide that designation to Federal Medical Centers are not completed at the institutional level, but are made at the Central office by the BOP's Medical Designator.  (Id.).  Medical referrals are ranked by the Medical Designator in order of urgent need of care and processed as bed space becomes available.  (Id.).  In addition, each medical facility is equipped to handle different levels of inmate security.  (Id.).  The

plaintiff is designated as a high security inmate.  (Id.).  As a result, it was necessary to refer the plaintiff to a medical center which could meet his security needs.  (Id.).

On January 27, 2005, the plaintiff was provided with refills for ophthalmic lubricant.  (Id.).

On May 12, 2005, and August 4, 2005, the plaintiff treated with the optometrist.  (Id.).  It was noted at that time that the plaintiff was on the list for a transplant at USMCFP-Springfield.  (Id.).

On September 8, 2005, the plaintiff was transferred from USP-Lewisburg to USMCFP-Springfield.  (Id.).

On December 20, 2005, the plaintiff filed the instant action, which was signed and dated November 16, 2005.  (Doc. No. 1).

On January 18, 2006, the defendants' materials indicate that the plaintiff underwent a successful surgical corneal transplant at USMCFP-Springfield. (Doc. No. 34, Ex. 2).  As of the filing of the defendants' materials, the plaintiff remained at USMCFP-Springfield.  (Id.).

The defendants' materials provide that, given the plaintiff's life sentence and significant security concerns, defendant Bussanich believed that the plaintiff's surgery and post-operative follow-up was best managed at a secure prison hospital facility, such as USMCFP-Springfield.  (Id.).  Although the plaintiff's eye condition was serious and his treatment necessary, it was not life threatening.  (Id.).  In addition, the defendants' materials provide that,

16

since the procedure entailed a corneal transplant, a delay in treatment, even if it included a worsening of the condition of the plaintiff's own cornea, would not likely affect the anticipated successful outcome of the treatment because the diseased cornea would be replaced.  (Id.).

Overall, the defendants' materials provide that the plaintiff received extensive treatment for his eye condition, as well as other conditions, while confined at USP-Lewisburg.  Specifically, from 2001 through 2005, the plaintiff was treated by either BOP or contract consultant health care staff in excess of 175 times.  (Id.).  During these treatments, the defendants' materials indicate that defendant Bussanich never claimed to be a specialist in the treatment of eye conditions.  (Id.).  As such, defendant Bussanich and his staff referred the plaintiff to various optometrists and ophthalmologists and followed the specialists' recommendations.  (Id.).

In response to the defendants' materials, the plaintiff simply reasserts the claims set forth in his complaint.  Moreover, the plaintiff relies upon documentation already submitted in conjunction with his complaint and submitted by the defendants in conjunction with their motion to dismiss and for summary judgment.  As set forth above, the plaintiff's response is insufficient to oppose the defendants' materials.

In order to establish an Eighth Amendment claim based upon allegations of denial of proper medical care, an inmate must demonstrate a deliberate indifference to a serious medical need.  Estelle v. Gamble, 429

17

U.S. 97 (1976).  This standard requires both deliberate indifference on the part of the prison officials and a serious medical need on the part of the prisoner.  See West v. Keve, 571 F.2d 158 (3d Cir. 1978).

A deliberate action is one which is intentional, requiring the actor to have knowledge of the events attributed to the injury and the ability to control the outcome.  "To establish a constitutional violation, the indifference must be intentional and the action related thereto deliberate." Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1081 (3d Cir. 1976).  A mere difference of opinion between the prison's medical staff and the inmate as to the diagnosis or treatment which the inmate receives, does not support an Eighth Amendment claim.  Farmer v. Carlson, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988).  See McCracken v. Jones, 562 F.2d 22, 24 (l0th Cir. 1977); Smart v. Villar, 547 F.2d 112, 113 (l0th Cir. 1976).

A medical need is "serious" where it has been diagnosed by a physician as mandating treatment, or if it is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.  See Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203 (1st Cir. 1990), cert. denied, 500 U.S. 956 (U.S. Mass. June 3, 1991) (No. 90-7632)(citing Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326 (3d Cir. 1987)).

The Supreme Court has held that negligence or inadvertence alone do not rise to the level of a constitutional deprivation.  Whitley v. Albers, 475 U.S. 312 (1986); Davidson v. O'Lone, 474 U.S. 344 (1986).  In Daniels v. Williams,

474 U.S. 327 (1986), the Court noted that "[l]ack of due care suggest no more than a failure to measure up to the conduct of a reasonable person."  Where a state of mind is relevant, the complaint is inadequate if it merely contains conclusory allegations describing the requisite state of mind such as "intentionally" or "recklessly" without supporting factual allegations.  Wilson v. Seiter, 501 U.S. 294 (1991).

Further, where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, the federal courts are generally reluctant to second guess medical judgment and to constitutionalize claims which sound in state tort law.  See  Ellison v. Scheipe, 570 F.Supp. 1361, 1363 (E.D.Pa. 1983); Inmates of Allegheny Jail v. Pierce, 612 F.2d 754,762 (3d Cir. 1979); See also Westlake v. Lucas, 537 F.2d 857, 860 n. 5 (6th Cir. 1976).  The key question is whether the defendant has provided the plaintiff with some type of treatment, regardless of whether it is what the plaintiff desired.  Farmer v. Carlson, supra, 685 F. Supp. at 1339.

With respect to the instant action, there is no dispute that the plaintiff had a serious medical need.  The question becomes whether the defendants were deliberately indifferent to the plaintiff's serious medical need.  Based upon the record before the court, it is clear that the defendants were not deliberately indifferent to the plaintiff's serious medical need.  To this extent, the plaintiff was treated on numerous occasions for his eye condition.  Moreover, he was referred to various optometrists and ophthalmologists by

19

defendant Bussanich.   The record indicates that defendant Bussanich followed the recommendations of these specialists with respect to the plaintiff's medical care.

Ultimately, on September 23, 2004, it was recommended that the plaintiff undergo a corneal transplant for his right eye.  That same day, the medical staff requested that a corneal transplant be scheduled for the plaintiff. That request was signed by defendant Bussanich on October 1, 2004. Shortly thereafter, on October 8, 2004, defendant Bussanich noted that he had completed the initial referral to a federal medical center for the plaintiff. A transfer referral was completed on November 29, 2004.  Once this referral was submitted, the decision as to where the plaintiff was placed on the waiting list for high security medical center bed space became the responsibility of the BOP's Medical Designator.  The plaintiff was advised while awaiting transfer that the outcome of the surgery would not be affected by his wait time.   In January 2006, after the filing of the instant action, the plaintiff underwent a successful corneal transplant.  Thus, although the plaintiff did not receive the treatment as quickly as he had wished, the record demonstrates that the defendants were not deliberately indifferent to his condition.

## IV. CONCLUSION

On the basis of the foregoing, **IT IS RECOMMENDED THAT:**

**(1)**    the defendants' motion to dismiss, **(Doc. No. 27)**, be **GRANTED** with respect to defendants Zagame and Hemphill, as employees of the United States Public Health Service, and to the extent that, under the FTCA, it would be substituted as a defendant, the United States;

**(2)**    to the extent that the defendants seek to have the plaintiff's complaint dismissed on the basis of lack of personal involvement and/or respondent superior, the defendants' motion to dismiss, **(Doc. No. 27)**, be **GRANTED**, with respect to defendants Lappin, Thoms, and Hufford, and **DENIED,** on this ground**,** with respect to defendant Dodrill;

**(3)**    the defendants' motion to dismiss, **(Doc. No. 27)**, be **GRANTED** with respect to the plaintiff's claims brought against the remaining defendants', (i.e., Smith, Brown, Dodrill, and Bussanich), in their official capacity; and

**(4)**    the defendants' motion for summary judgment, **(Doc. No. 27)**, be **GRANTED** with respect to the remaining defendants, (i.e., Smith, Brown, Dodrill, and Bussanich), as discussed above.

S/ Malachy E. Mannion

**MALACHY E. MANNION**
**United States Magistrate Judge**

**Date:  September 21, 2006**

O:\shared\REPORTS\2005 Reports\05-2633.01.wpd